**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Andrew Carmen MENICHINO,
Defendant-Appellant.**

**No. 73-2511.**

United States Court of Appeals,
Fifth Circuit.

July 29, 1974.

---

18. 6 Moore, Federal Practice ¶ 7.04.

Gerald A. Messerman, Cleveland, Ohio, for defendant-appellant.

Robert W. Rust, U. S. Atty., Barbara E. Vicevich, Asst. U. S. Atty., Samuel Sheres, Sp. Atty., Dept. of Justice, Miami, Fla., for plaintiff-appellee.

Before RIVES, WISDOM and MORGAN, Circuit Judges.

**WISDOM, Circuit Judge:**

Andrew Menichino appeals his conviction and the sentence imposed after a jury brought in a verdict of guilty against the defendant on charges of conspiracy and importing and possessing with intent to distribute a Schedule II narcotic controlled substance (cocaine).

Menichino first asserts that several incriminating statements he allegedly made after he was arrested were allowed in evidence in violation of the strictures set out in Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and its progeny. Menichino next contends that an out-of-court statement linking him to the purchase of cocaine was admitted in violation of his right to confront the witnesses against him and without sufficient independent evidence of his participation in a conspiracy to justify the government's invoking the co-conspirator exception to the hearsay rule. Finally, the appellant maintains that the disparity between his sentence and that imposed on his co-defendant is violative of his rights to the equal protection of the laws and to trial by jury, and that his severe sentence may have resulted from the improper use of an erroneous presentence report. We find all of these contentions to be without merit. We affirm.

**I.**

On February 2, 1973, Menichino's co-defendant, Stephen Thomas Brown, and a friend named Taron Caine left the United States for Bogota, Colombia, to start a clothing business. On February 14, 1973, Caine told Brown that before leaving the United States he had received ten thousand dollars from a person whom Brown had met, but knew only as "Andy". As Andy had instructed, Caine related, he had used the money to purchase 3.3 pounds of cocaine, which he and two unnamed Colombians had secreted in a suitcase. Caine asked Brown to take the suitcase to Grand Rapids, Michigan, to call "Andy", and to give him the cocaine. Brown agreed, and flew from Bogota to Miami with the contraband, but upon his arrival at the Miami Airport, the cocaine was discovered in a routine customs inspection and Brown was arrested. After his arrest, Brown agreed to cooperate with customs authorities, and to deliver the cocaine as Caine had directed.

On February 19th, Brown and a special customs agent flew to Detroit, drove to Grand Rapids, and, after they had been joined by other customs agents with recording equipment, called the telephone number given Brown by Taron

Caine. They recorded a brief conversation with a woman who gave them the number of a pay telephone, at which they could reach Andy "in twenty minutes". Brown made the second call, which was also recorded, and a meeting was arranged between Brown and Andy at the cocktail lounge of a nearby Howard Johnson's restaurant. At the restaurant, "Andy", who was identified as the defendant-appellant Andrew Menichino, asked Brown how much cocaine he had with him, and remarked that he could sell it all within a week to ten-day period. A handbag containing some cocaine (and several pounds of dextrose which had been substituted for the bulk of the shipment) was exchanged, and Menichino left, but was apprehended as he drove from the restaurant parking lot. On the seat of the car was the handbag containing the cocaine which Menichino had received from Brown.

Upon arrest, Menichino was advised of his rights. He stated that he understood them, and was taken to a police station for processing. When he arrived, a written form advising him of his rights was read to the appellant, and he again stated that he understood his rights, but declined to make a statement or sign the waiver or rights form and requested that he be permitted to call his attorney. He was told that he could call his attorney as soon as the "biographical" was taken, a process during which he would be fingerprinted, photographed, and asked to provide such information as his name, address, and social security number for police records. Menichino agreed. During this period there was no interrogation about the crime by police officers or customs agents.

Nonetheless, several statements introduced at trial were volunteered by Menichino during this period. While the bio-

graphical information was being obtained, Menichino asked what charges would be filed against him. He was told that he would be charged with smuggling narcotics, illegal importation of narcotics, and possession of narcotics with intent to distribute. Menichino then said, "I don't know if you guys got me on those smuggling charges, but you sure have me on possession." Later, another agent entered the room, remarked that he had been inventorying Menichino's automobile, and asked him a question about it. Menichino said, "I was lucky I was driving the Olds, you don't think I want you guys driving my Jaguar." Menichino also asked an agent, "How long have you had my phone tied up?" He apparently made two further statements, again without prompting from the agents or other law enforcement officers present: "You guys just got the small load, you missed the big one"; and "You guys have a good time on that stuff, that stuff is good." [1] Even after these statements were made, no follow-up questions were asked by the agents, and once the booking process was complete, Menichino called and spoke to someone whom he identified as his attorney. He was then taken to the county jail.

Menichino was charged in a three-count indictment with (1) illegally importing cocaine into the United States in violation of 21 U.S.C. § 952 and 18 U.S.C. § 2, (2) possessing cocaine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and (3) criminal conspiracy to violate 21 U.S.C. § 952(a). Brown was similarly charged. Both defendants pleaded not guilty, but on the day the trial commenced, May 22, 1973, Brown withdrew his not guilty plea, submitted a plea of guilty to the conspiracy count, and the other charges were dropped. Menichino

---

1. In oral argument, counsel for the Government pointed out that this final statement was made after Menichino had spoken by telephone to someone whom he identified as his attorney. Neither the appellant nor the appellee contends that this fact alters the impact of *Miranda* here, however, and it is undisputed that Menichino's attorney was not present when the statement was made.

was then tried alone, and Brown testified for the prosecution. Menichino was found guilty on all three counts. At sentencing, Menichino's attorney asked to see the defendant's presentence report. This request was complied with, and Menichino then received concurrent seven-year sentences on each of the three counts, and a three-year special parole term as well. Brown was sentenced to two years probation, plus a three-year special parole term which was suspended.

## II.

The appellant's first contention compels us to examine four of our post-*Miranda* decisions: United States v. McDaniel, 5 Cir. 1972, 463 F.2d 129, cert. denied 1973, 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041; United States v. Ramos, 5 Cir. 1971, 448 F.2d 398; United States v. Phelps, 5 Cir. 1971, 443 F.2d 246; and United States v. Hopkins, 5 Cir. 1970, 433 F.2d 1041, cert. denied 1971, 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550. Each of these decisions concerns, in a slightly different context, the problem that confronts us here: the interplay between *Miranda's* requirement that law enforcement officers unequivocally advise suspects that they have a right to consult counsel immediately, before undergoing custodial interrogation, and its caveat that statements *volunteered* by a suspect may be admitted against him at trial. Here, when counsel was requested, interrogation as to the defendant's involvement in criminal activity ceased; but counsel was not *immediately* provided, and apparently the defendant made voluntary but incriminating statements during the interim.

Although the parties do not really contest the context in which the statements were made, they vigorously dispute its significance. Thus, Menichino contends not only that his statements were improperly admitted at trial, but that the affront to *Miranda* was twofold. First, although he was advised of his right to counsel and his right to re-

main silent, the warning was a qualified one, since he was told that counsel would be available only after the "biographical" was taken and processing was complete. Such a warning, Menichino maintains, indicating that counsel would be available only in the future, runs afoul of *Miranda's* requirement that counsel be made available "here and now." See Lathers v. United States, 5 Cir. 1968, 396 F.2d 524, 535. Second, once he had indicated a desire to remain silent and to consult an attorney, the officers nonetheless continued to interrogate him, and during this interrogation incriminating statements were elicited. *Miranda* will not countenance the admission of such statements at trial, the appellant concludes, and reversal is therefore required. Many of the appellant's assertions, at least as general principles, are unassailable, and are not in fact contested by the Government. Rather, the government's point is a limited one: the admission of Menichino's statements is not forbidden by *Miranda,* since they were made voluntarily and were not the product of custodial interrogation. To determine whether admitting the statements was proper, then, we turn first to *Miranda.*

Central to the thrust of the *Miranda* decision is the right of a suspect to consult with an attorney before he is questioned and to have counsel present at any in-custody interrogation. 384 U.S. at 470, 86 S.Ct. at 1626, 16 L.Ed.2d at 721. Once warned, a suspect may waive his right to counsel, but if he indicates at any time before or during questioning that he wishes to remain silent or desires an attorney, questioning must cease, at least until an attorney is present. 384 U.S. at 473–474, 86 S.Ct. at 1627, 16 L.Ed.2d at 723. This does not mean, the Court was careful to point out, that each police station must have a "station house lawyer" at the ready to consult with each suspect as soon as he is apprehended. Nor does *Miranda* teach that the police may do nothing concerning the investigation of a crime until

counsel is provided.[2] What is prohibited is custodial interrogation absent counsel or proper waiver. 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

Balanced against this principle in cases such as the present controversy is another tenet, for *Miranda*, by its terms, is not designed to exclude statements freely given by a suspect after he has been properly advised of his rights:

Any statement given freely and voluntarily without compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is *allowed* to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today. [Emphasis added.]

384 U.S. at 478, 86 S.Ct. at 1630, 16 L. Ed.2d at 726. As an examination of the four decisions of this Court cited above will illustrate, it is this second principle that is the proper fulcrum for our decision here.

The earliest of the four, United States v. Hopkins, involved a defendant who, like Menichino, refused to sign a form waiving his rights to silence and counsel. When the agent questioning him then attempted to terminate the interrogation, however, Hopkins initiated a second conversation, during which he made an incriminating statement. The Court there held that since there was no evidence that the agent persisted in interrogating Hopkins after his refusal to sign the waiver form, the Government had met its "heavy burden" of demonstrating true waiver. To the Court, this situation was analogous to "those instances where the accused voluntarily confesses prior to questioning". 433 F. 2d at 1044.

Two 1971 decisions, United States v. Phelps and United States v. Ramos, fur-

ther refined the principles outlined in *Hopkins*. In *Phelps,* a successful motion to suppress was vacated and remanded because the initial hearing on the motion did not reveal whether the questions which elicited the incriminating statements were "the result of voluntary conversation initiated by Phelps" or "were initiated by the officers themselves without any instigation by Phelps". If the statements were officer-initiated, the Court held, *Hopkins* mandates exclusion; if Phelps's statements were truly voluntary, however, they properly could be admitted. 443 F.2d at 249–250. In *Ramos*, no remand was required since the record,

clearly reveal[ed] that neither of the defendants voluntarily initiated further conversations subsequent to their refusal to sign a waiver form. Rather, the Government agent himself initiated further questioning without any instigation by either defendant. Therefore, under our decision in *Phelps,* we hold that the agent's refusal in this case to terminate each interview violated the Supreme Court's mandate in *Miranda* and that the defendants' incriminating statements were thereby rendered inadmissible.

448 F.2d at 399.

United States v. McDaniel involved a defendant who was apprehended while transporting burlap bags containing marihuana in the trunk of his car, and thereafter made incriminating statements. We declined to exclude the statements, since they "were not made in response to any questions by the agents *that solicited any information regarding the contents of the trunk*". [Emphasis added]. Like Menichino, McDaniel had been given full *Miranda* warnings, but had declined to sign a waiver form.

■■ From these decisions, we can distill a standard against which to judge the admission of the statements here: Incriminating statements elicited by law enforcement officers through questions

---

2. We do not understand the appellant to argue that "booking" a suspect without

counsel present is a per se violation of *Miranda.*

relating to the criminal activity itself, during an interrogation fairly characterized as custodial and after a refusal to sign a waiver form or a request for counsel, may not be admitted at trial. So viewed, the statements challenged here are admissible. Menichino was at least twice advised of his rights. He twice stated that he understood them, and on the second occasion, refused to sign a waiver of rights form and asked to call his attorney. Once this desire was expressed, the agents present asked no further questions about Menichino's involvement in criminal activity, and told him that he could telephone his attorney as soon as some biographical information was obtained from him. Menichino agreed, and during the course of the questioning, fingerprinting, and photographing process, he volunteered the incriminating statements. In these circumstances, neither *Miranda,* nor this Court's decisions interpreting it, requires exclusion of Menichino's statements.

The appellant, however, would have us rely on the District of Columbia Circuit's decision in Procter v. United States, 1968, 131 U.S.App.D.C. 241, 404 F.2d 819. In *Procter,* incriminating statements made by a defendant during the booking process and before an attorney was available were held to be protected by *Miranda,* and the case was remanded to determine whether a valid waiver of *Miranda* rights had occurred. Quoting Mallory v. United States, 1957, 354 U.S. 449, 454, 77 S.Ct. 1356, 1359, 1

L.Ed.2d 1479, 1483, the court held that, "* * * The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, *even if not so designed,* to eliciting damaging statements . . . ." 404 F. 2d at 821 [emphasis by D.C. Circuit].

We decline to follow *Procter* for two reasons. First, the biographical questions asked here did not "lend [themselves] . . . to eliciting damaging statements . . . ." The interrogation appears to have been a straightforward attempt to secure biographical data necessary to complete booking, and the questions asked did not relate, even tangentially, to criminal activity. *McDaniel* suggests that such inquiry is permissible, a suggestion we endorse here.[3] Moreover, and more importantly, in *Procter,* the incriminating statement was made *in response* to one of the questions asked Procter during the booking procedures. Thus, the court concluded, "[h]is answers . . . cannot be considered voluntary in the sense required by Miranda". 404 F.2d at 821. In considering Menichino's statements, we have reached an opposite conclusion. Had his statements been made as answers to officer-initiated inquiries, we would have to decide whether to follow *Procter* and exclude such non-voluntary utterances. Here, however, Menichino volunteered the statements incriminating him, and their admission constitutes no affront to *Miranda.*

---

3. This position is also adopted by Tentative Draft No. 6 of the American Law Institute's Model Code of Pre-Arraignment Procedure. Article 140 of the Code, which carefully defines the permissible conditions of in-custody investigation and interrogation, specifically exempts non-investigative interrogation from its stringent safeguards:

 (5) *Non-Investigative Questioning*: As used in this Code, 'questioning' refers to questioning designed to investigate crimes or the involvement of the arrested person or others in crimes. Compliance with the procedures set forth in this Article 140 is not required in connection with other con-

versation between the arrested person and law enforcement officers.

ALI Model Code of Pre-Arraignment Procedure § 140.8(5) (Tent. Draft No. 6, 1974). In explaining this provision, the Code's Reporter observes that "[t]his subsection makes it explicit that the word 'questioning' is meant to cover *investigative* questioning". [Emphasis in original]. ALI Model Code of Pre-Arraignment Procedure § 140.8, Note (Tent. Draft No. 6, 1974), at 44. In an instance of non-investigative interrogation such as that presented here, then, like *Miranda,* the ALI Model Code would not require exclusion of volunteered statements.

### III.

Next the appellant challenges the admission of Stephen Brown's testimony at trial to the effect that Taron Caine told him that Menichino had given him [Caine] ten thousand dollars to purchase cocaine in Colombia.[4] This testimony was hearsay, the appellant asserts, and to admit it was error, both because the proper foundation was not laid to admit it under the co-conspirator's exception to the hearsay rule, and because it denied Menichino the right to confront the witnesses against him. Also challenged is a preliminary instruction by the trial court concerning the manner in which the jurors should view the testimony of an alleged co-conspirator. None of these objections requires reversal, however.

We turn first to Menichino's contention that there was not sufficient independent proof of a conspiracy to invoke the co-conspirator's exception to the hearsay rule. The appellant does not quarrel with the long-standing maxim that the statements of one conspirator to a third party are admissible against his co-conspirator at trial if there is independent proof of the existence of the conspiracy and the co-conspirator's participation in it. See Lutwak v. United States, 1953, 344 U.S. 604, 617, 73 S.Ct. 481, 489, 97 L.Ed. 593, 603; Glasser v. United States, 1942, 315 U.S. 60, 74–75, 62 S.Ct. 457, 467, 86 L. Ed. 680, 701. Rather, Menichino argues that since the Government offered no evidence (other than the challenged statement) of any communication or meeting between him and Taron Caine, there is no evidence establishing the "likelihood of an association for illegal purposes" among Brown, Caine and Menichino. Thus there was no independent proof of Menichino's participation in a conspiracy, and the hearsay statement was improperly admitted.

We cannot agree. To establish the existence of a criminal conspiracy all that need be proved is an agreement between two or more people to commit an offense, followed by an overt act by at least one of them in furtherance of the plan's illegal end. United States v. Falcone, 1940, 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128, 132. On the face of Brown's testimony, an agreement was shown among Caine, Brown, and the unnamed Colombians to smuggle cocaine into the United States and to transfer it once there. Certainly Caine's concealment of the narcotic in Brown's suitcase and Brown's attempt to enter the United States with the drug are sufficient to fulfill the overt act requirement. Nor can Menichino argue that if a conspiracy existed the evidence was insufficient to weave him to its web. On the basis of uncontroverted non-hearsay testimony, it is apparent that Brown called a Grand Rapids telephone number given him by Caine, and was told to telephone "Andy" in twenty minutes at another number. Once Brown placed the second call, a meeting was arranged at which Menichino inquired, without prompting from Brown, about the quality and quantity of the "stuff" in Brown's possession, discussed his plans for its distribution, and accepted delivery of the cocaine. Although it is true that an individual's mere presence at the scene of a crime or mere association with persons involved in a criminal enterprise is not sufficient to prove participation in a conspiracy,

---

4. Q Mr. Brown, what conversations, if any, did you have with Taron Caine concerning the money to be paid for the cocaine?
 A I was told that the money was already paid, that it was given to him before he went with me to Columbia and it was given to him by Andy.
 Q Now, when you say he, who told you?
 A Taron Caine.
 Q Specifically what did he tell you about the money?
 A He told me that it was given to him by Andy for the purchase of cocaine.
 Q Approximately how much money was involved?
 A Ten thousand dollars.
 Q When did Taron Caine tell you this?
 A The Wednesday—the day that he bought the cocaine.

United States v. Owen, 5 Cir. 1974, 492 F.2d 1100, 1103–1104, much more has been shown here. Menichino was at the scene of the transfer not by chance but by design; his was the role not of a mere observer but of that of the mastermind of the criminal transaction. His actions are consistent only with the hypothesis that he was the knowing and willing terminal link in a chain forged in Colombia. Once, as here, a conspiracy has been demonstrated, such substantial circumstantial evidence will suffice to prove a defendant's participation in it, and to sanction the admission of hearsay testimony from his co-conspirators. Lopez v. United States, 5 Cir. 1969, 414 F.2d 909, 911.

■ Menichino also argues, however, that even if Caine's statement to Brown was properly received under an exception to the hearsay rule, admitting it was error since the confrontation values implicit in the Sixth Amendment were violated by its admission. California v. Green, 1970, 399 U.S. 149, 155, 90 S.Ct.1930, 1933–1934, 26 L.Ed.2d 489, 495, made it plain that although the confrontation clause protections and the hearsay rule overlap, they are not coextensive. Thus even statements properly admitted under hearsay rules may be examined by the court to assure that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement". Dutton v. Evans, 1970, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213, 227, quoting California v. Green, 399 U.S. at 161, 90 S.Ct. at 1936, 26 L.Ed.2d at 498. Read together, *Green* and *Dutton* instruct that a case-by-case analysis is necessary to determine

> whether, under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of

a satisfactory basis for evaluating the truth of the extrajudicial declaration. United States v. Adams, 9 Cir. 1971, 446 F.2d 681, 683, cert. denied, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257. If so, and if the challenged testimony is "crucial" to the prosecution or "devastating" to the defense, it must be excluded.

■ Several Court of Appeals have avoided the necessity of the case-by-case analysis in some federal prosecutions by discerning a congruence between the Confrontation Clause and the federal co-conspirator rule that the Supreme Court did not find in *Dutton's* analysis of the more wide-ranging Georgia co-conspirator exception.[5] We need not yet call this Court to that muster, however, since it is apparent here that the challenged testimony was neither "crucial" nor "devastating". As we pointed out above, there was ample evidence to establish the existence of a conspiracy— and Menichino's membership in it— without Caine's statement that "Andy" had given him ten thousand dollars to purchase cocaine. The same evidence was ample to convict him on the illegal importation count. And, plainly, the statement objected to by the appellant could have had no impact on the possession with intent to distribute count. Despite Menichino's protestations, then, the statement was neither "crucial" to the prosecution's case, nor was its admission "devastating" to the defense. Thus *Dutton* and *Green* do not require its exclusion.

■ Menichino also challenges an instruction delivered to the jury by the court immediately following Brown's testimony concerning the out-of-court declarations by Taron Caine:

> THE COURT: Ladies and gentlemen of the jury, the conversations of

---

5. As the First Circuit has phrased it:
 The federal co-conspirators rule, deeply embedded in usage, grounded on the presumed reliability of admissions against interest, and safe-guarded by the requirement of a prima facie agreement, does not violate the confrontation clause.
 United States v. Clayton, 1 Cir. 1971, 450 F.2d 16, 20, cert. denied, 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250; accord, United States v. Cox, 10 Cir. 1971, 449 F.2d 679, 688–689, cert. denied, 1972, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136; United States v. Weber, 3 Cir. 1970, 437 F.2d 327, 339–340, cert. denied, 1971, 402 U.S. 982, 91 S.Ct. 1524, 28 L.Ed.2d 867.

persons who are members or who there is some evidence in the record to indicate are members of a conspiracy may be considered by the jury in determining whether or not the Government has proven the case beyond and to the exclusion of all reasonable doubt with respect to a conspiracy charge. A conspiracy is charged in Count I. Conspiracies are not charged in Counts II and III of this indictment.

Therefore, you will not consider—and you will be instructed at the conclusion of the trial—the statements that the witness just made with respect to his conversations with Taron Caine when you are considering Counts II and III.

You may consider and give such weight as you think appropriate the conversations that have just been related with Taron Caine when you are considering Count I.

You see, normally hearsay testimony is not admissible except when you are dealing with a conspiracy.

So, you may only consider the hearsay testimony just related by the witness when you are considering Count I. You may not consider it when you are considering Counts II and III. You will be further instructed on this at the conclusion of the case.

Although the defense made no immediate objection to this instruction, at the commencement of proceedings the morning after it was given, Menichino's attorney asked that the jury be instructed that in giving the previous day's charge, the court had not intended to voice an opinion as to the existence or non-existence of a conspiracy involving the defendant.[6] The court agreed, and at the close of trial, in addition to rendering a full and proper exposition of the weight to be given a co-conspirator's testimony,[7] the court delivered a curative instruction disavowing any opinion, express or implied, as to the facts of the controversy.[8] Menichino now contends that the challenged instruction left the jury with the impression that the court

6. MR. MESSERMAN: Your Honor, before the jury is brought in I have a motion for you to rule upon.

First, Your Honor, yesterday the Court overruled the objection to the co-conspirator statement and the Court instructed the jury that the statement was coming in under the co-conspirator exception to the hearsay rule stating that this is an exception to the hearsay rule.

I think, Your Honor, that the instruction, the statement that was given, although I appreciate the fact the Court indicated that it would be instructed more fully concerning that question, implied the existence of a conspiracy and I would ask Your Honor that the jury be instructed at this point that the Court by admitting that testimony did not intend to indicate any opinion concerning the existence or non-existence of the conspiracy and the Court will charge the jury more fully concerning the manner in which this evidence is to be considered at the conclusion of the case.

THE COURT: All right.

7. The court instructed:

In determining whether or not a defendant or any other person, was a member of a conspiracy, the jury are not to consider what others may have said or done. That is to say, the membership of a defendant,

or any other person, in a conspiracy must be established by the evidence in the case as to his own conduct what he himself wilfully said or did.

Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed, and that a defendant was one of the members, then the statements thereafter knowingly made and the acts thereafter knowingly done by any person likewise found to be a member, may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the statements and acts may have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy and in furtherance of some object or purpose of the conspiracy.

Otherwise, any admission or incriminatory statement made or act done outside of court, by one person, may not be considered as evidence against any person who was not present and did not hear the statement made, or see the act done.

8. The court cautioned:

The function of the jury is to determine the facts. This should be done without prejudice, sympathy, fear or favor, and solely from a fair consideration of the evi-

believed a conspiracy existed. Even were we to read the special instruction as does the appellant—and we do not—any harm done by the charge was vitiated by the later proper and curative instructions.

## IV.

 In his final series of contentions, the appellant attacks his sentence, three concurrent seven-year terms and a special parole term of three years. First, Menichino cites the fact that Brown, who was charged in the same indictment as the appellant but pleaded guilty to a single count, received only two years probation and a three-year parole term. Not only does this disparity deny him the equal protection of the laws, Menichino contends, but "it is perfectly evident that appellant was penalized for his insistence upon the right to a trial". Challenges to a sentence within the statutory maximum must be viewed against the backdrop of countless decisions by this Court resting the determination of sentence in the hands of the district judge; only if the district court has abused its discretion will the sentence be disturbed on appeal. E. g., Finch v. United States, 5 Cir. 1974, 493 F.2d 455, 456; United States v. McGhee, 5 Cir. 1974, 488 F.2d 781, 786, petition for cert. filed. Thus, although the appellant cloaks his contentions in constitutional guise, it is only an abuse of discretion that we must look for, since it is patent that the imposition of a sentence within the statuory limit "does not ascend to the orbit of a constitutional violation". Castle v. United States, 5 Cir. 1968, 399 F.2d 642, 652.

 So viewed, it is apparent that this sentencing decision reveals no abuse of discretion. Menichino's contention that he received a harsher sentence than Brown because he failed to plead guilty is belied by the relative roles the two men played in the narcotics enterprise. Menichino was the moving force, the man whose money gave the impetus to the entire operation. Without the ten thousand dollars he gave Taron Caine, the Colombian "connection" could never have taken place. Moreover, if, as Menichino boasted, the customs agents "just got the small load, [but] missed the big one", the district judge properly could have inferred that Menichino's involvement in illegal narcotics importation was both extensive and direct. Stephen Brown, on the other hand, was a mere courier, and when apprehended by the customs officials, he agreed to assist the Government in capturing Menichino, the apparent chieftain of the operation. He testified against Menichino at trial. The judge did not abuse his discretion in imposing a relatively lenient sentence on Brown, in light of his minor role in the scheme, and his cooperation with customs officials.

Finally, Menichino alleges due process violations in the district court's use of a presentencing report which contained "anonymous accusations of criminal conduct against the accused". The appellant's attorney asked at the time of sentencing to see the report and, after examining it, denied its implication that Menichino was involved in criminal activity which had not been the basis of any formal charge. He neither objected to the imposition of sentence at that time, nor sought a continuance of the sentencing hearing. We have examined the transcript of the sentencing hearing and are convinced that there was no denial of due process as a result of the use of the presentencing report. Counsel for the defendant made an able and effective argument for leniency, and his client received a sentence less than the statutory maximum. Since he did not

---

dence. The evidence should be considered and viewed by the jurors in the light of their own observations, experience and common sense. If during the trial, the Court has intimated any opinion as to the facts of this case, the jury should entirely disregard such intimation, since you, the jurors, are the sole and exclusive judges of the facts.

ask that sentencing be delayed, he cannot now object to its result.

For the reasons outlined above, the conviction and sentence appealed from are

Affirmed.