**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Homero GLEN–ARCHILA, Dudley Astor**
**May-Mitchell, Defendants-Appellants.**

No. 80–5395.

United States Court of Appeals,
Eleventh Circuit.

June 4, 1982.

Archibald J. Thomas, III, Asst. Federal Public Defender, Jacksonville, Fla., for Glen-Archila.

Philip Carlton, Jr., Thomas A. Wills, Miami, Fla., for May-Mitchell.

Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before FAY, JOHNSON and HENDERSON, Circuit Judges.

JOHNSON, Circuit Judge:

Dudley May-Mitchell and Homero Glen-Archila, crew members of a ship on which the Coast Guard found a cargo of marijuana during a stop and search in international waters off the Florida coast, appeal their convictions for violations of this country's drug laws. We affirm.

## I. FACTS

We recite these facts in the light most favorable to the government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

In 1979 a Coast Guard cutter came upon the British ship CAYMAN MAN twenty miles from St. Augustine. Boatswain's Mate James Caldwell hailed the ship. Appellant May-Mitchell appeared. He stated that the ship was losing power, that he could not start her engines, and that her captain was due to return with repair parts.

He declined an offer of assistance. The cutter backed off but stayed near the ship overnight and approached within about six feet of her the next day. Caldwell again talked to May-Mitchell who stated that the ship's captain would return that afternoon and that he needed no aid. Caldwell, while talking to May-Mitchell, detected a strong odor of marijuana coming from the ship.[1]

The Coast Guard, acting through the State Department, received permission from the British Shipping Commission to board the ship and seize samples of evidence. The Commission, however, refused to allow the Coast Guard to seize the ship.[2] Armed Coast Guardsmen boarded the ship and found marijuana in the hold. Caldwell told May-Mitchell that the Coast Guard's boarding authority was limited and that none of the crew members were under arrest. He noted, however, that, if May-Mitchell consented, the Coast Guard would tow the vessel into port. May-Mitchell discussed the matter with his crew. With the seas heavy, the weather worsening, and the sun having set, May-Mitchell stated in writing that he would like to have the CAYMAN MAN towed into port despite the knowledge that he would be arrested once within the waters of the United States.

After a test proved that the ship's cargo was marijuana, Caldwell told May-Mitchell of the result and of his estimate that ten to fifteen tons were on board. May-Mitchell stated that 30,000 pounds of marijuana were on the ship.[3] Caldwell later mentioned to May-Mitchell that it was too bad that the captain was not on board and that all of this was happening to him, prompting May-Mitchell to respond that, if the captain did not return, he had been told to make two drops and then go to Nassau in the Bahamas.

May-Mitchell and Glen-Archila, a crew member, were arrested soon after the CAYMAN MAN was towed to a Coast Guard

---

1. Caldwell testified that, having dealt with ships carrying marijuana eight or nine times before, he was familiar with the odor of marijuana.

2. May-Mitchell asserts that the Commission only consented to boarding, not search, of the

ship. The magistrate, in a report adopted by the district court, stated otherwise. Resolution of this issue has no bearing on our holding.

3. The actual amount on the ship was 26,660 pounds.

station. The crew members were told to put their personal possessions in plastic bags and to take the bags with them as they left the ship. As the crew members were being processed, law enforcement officials went through the bags, taking, among other things, a navigation book from May-Mitchell's bag and an electrician's certificate from Glen-Archila's bag. During interrogation by an immigration officer, and before being read his *Miranda* rights, Glen-Archila gave his home address in Colombia.

The crew of the CAYMAN MAN, excepting one sailor, was put on trial. The jury convicted May-Mitchell and Glen-Archila of conspiracy to import marijuana into the United States in violation of 21 U.S.C.A. § 963. They appeal.

## II. AUTHORITY TO STOP AND SEARCH

Appellants contend that the United States had no jurisdiction over the CAYMAN MAN, a foreign ship in international waters.[4] Without such jurisdiction, they as-

sert, the Coast Guard had no authority to stop and board the ship,[5] and all searches subsequent to the boarding must therefore be suppressed as unreasonable under the Fourth Amendment.[6]

We reject this contention. In *United States v. Williams*, 617 F.2d 1063, 1076 (1980) (en banc), the former Fifth Circuit held that the Coast Guard has authority under 14 U.S.C.A. § 89(a) to stop a foreign vessel on the high seas if there exists a reasonable suspicion that the vessel is engaged in smuggling contraband into the United States. This statute, the Court continued, does not violate the Fourth Amendment. *Id.* at 1083–84. The requisite reasonable suspicion for the stop exists in this case. Boatswain's Mate Caldwell detected the odor of marijuana coming from the CAYMAN MAN; detection of that odor has been held to provide not merely reasonable suspicion but probable cause for a stop.[7] *United States v. Erwin*, 602 F.2d 1183, 1184 (5th Cir. 1979), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980). Ap-

---

4. Appellants also assert that the United States has no jurisdiction over the case, apparently because no overt act in furtherance of the conspiracy was committed in the United States. They are incorrect. The former Fifth Circuit has held that in cases such as this, under 21 U.S.C.A. § 963, "[t]he fact that appellants intended the conspiracy to be consummated within the territorial boundaries satisfies jurisdictional requisites." *United States v. Ricardo*, 619 F.2d 1124, 1129 (5th Cir.), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980); *accord, United States v. DeWeese*, 632 F.2d 1267, 1271 (5th Cir. 1980), *cert. denied*, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981). There was sufficient proof of intent to import marijuana into the United States for jurisdiction to exist. *See* text at note 21, *infra*.

5. Appellants do not contend that the actual search of the vessel violated the Fourth Amendment even if we find the initial stop and boarding lawful. They admitted at oral argument that they had no legitimate expectation of privacy in any area of the vessel searched. They also conceded at oral argument that they had no legitimate expectation of privacy in the plastic bags in which they put their belongings before leaving the ship.

6. The Fourth Amendment covers the seizure and search of foreign vessels on the high seas by United States law enforcement officials.

*United States v. Williams*, 617 F.2d 1063, 1078 (5th Cir. 1980) (en banc); *United States v. Cadena*, 585 F.2d 1252, 1262 (5th Cir. 1978).

Appellants emphasize that they have standing to contest searches resulting from an illegal seizure even if they have no legitimate expectation of privacy. The government does not contest their standing on appeal. Appellants, we believe, do have standing to contest a search resulting from an illegal seizure. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976); *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *United States v. Cruz*, 581 F.2d 535, 539, 542 (5th Cir. 1978) (en banc); *see also Rakas v. Illinois*, 439 U.S. 128, 160 n.5, 99 S.Ct. 421, 439 n.5, 58 L.Ed.2d 387 (1978) (White, J., dissenting). We note, in any event, that the Supreme Court has indicated that in Fourth Amendment cases the courts should subsume standing analysis into their substantive inquiry. *Rakas, supra*, 439 U.S. at 138–40, 99 S.Ct. at 427; *see also United States v. Long*, 674 F.2d 848, 852 n.5 (11th Cir. 1982).

7. Appellants note that Boatswain's Mate Caldwell testified at trial that he had no reasonable suspicion that illegal activity was afoot on the CAYMAN MAN. They then assert that this proves that there was no reasonable suspicion, in a legal sense, for the stop and boarding of the vessel. Caldwell's statement is relevant to

pellants assert, however, that, even if it was reasonable to suspect that marijuana was on the ship, there was no reasonable suspicion regarding a violation of this country's laws. As they note, the law of the United States at the time of the seizure [8] required an intent to import marijuana into the United States. There was, they aver, no indication that the marijuana on the ship was destined for the United States. We disagree. The presence of the CAYMAN MAN only 20 miles from the Florida coast is an adequate basis for a reasonable suspicion of intent to import marijuana into this country.[9] See United States v. Ricardo, 619 F.2d 1124, 1128 (5th Cir.), cert. denied, 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980).[10] There was no Fourth Amendment violation.[11]

## III. *MIRANDA* ISSUES

### A. May-Mitchell's Statements

■ The district court, adopting the magistrate's report, found that May-Mitch-

ell spontaneously and voluntarily stated that his ship carried 30,000 pounds of marijuana and that he was to make two drops before proceeding to the Bahamas. Our duty is to make an "independent evaluation" of this finding. *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978); see also Davis v. North Carolina, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966). If we uphold the finding, the statements are, as the district court concluded, admissible despite the absence of *Miranda* warnings.[12] See, e.g., United States v. Sabin, 526 F.2d 857, 859 (5th Cir. 1976).[13] May-Mitchell seeks to have us rule the statements inadmissible. Though admitting that they were not the product of direct interrogation, he argues that the statements were not spontaneous because they were the result of the functional equivalent of interrogation.[14]

■ The Supreme Court, as May-Mitchell notes, has stated that "the definition of

a determination on whether reasonable suspicion existed, but it is for the court, not a witness, ultimately to resolve whether, under the facts available to a law enforcement officer, the legal standard for reasonable suspicion was met.

8. In 1980, after the seizure at issue here, Congress passed 21 U.S.C.A. §§ 955a & 955c, which make illegal conspiracy to possess or to possess with intent to distribute a controlled substance, eliminating the need to prove that the intended destination of the controlled substance is the United States.

9. Further proof that the United States was the intended destination for the marijuana was introduced at trial. See text at note 21, infra.

10. We note that the consent of the British Shipping Commission to the boarding and search of the CAYMAN MAN might provide an alternative basis for finding that the search did not violate the Fourth Amendment. See Williams, supra, 617 F.2d at 1077, 1083; but cf. note 1, supra.

11. Glen-Archila brings another Fourth Amendment claim, urging us to rule that his electrician's certificate should have been suppressed as evidence because there was no showing that it was not obtained in violation of the Fourth Amendment. Assuming, without deciding, that the government had the burden of proof to show no Fourth Amendment violation, we find

that it met that burden. The record indicates that the documents were among Glen-Archila's personal effects taken from him when he debarked the CAYMAN MAN after it was towed into port. Glen-Archila does not himself argue that the searches after debarkation, or earlier ones, violated the Fourth Amendment. He does adopt May-Mitchell's arguments, which we rejected above.

12. For the *Miranda* warnings to be necessary, interrogation must be in a custodial context. *United States v. Jonas,* 639 F.2d 200, 203 (5th Cir. 1981). The government does not argue that the context was not custodial. Its decision was wise, since the appellants clearly were in custody during the times at issue. See id. (describing test for determining whether interrogation was in custodial context).

13. May-Mitchell also argues that any statements, spontaneous or not, made before *Miranda* warnings are given should be suppressed. *Miranda* itself resolved this issue otherwise. *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966).

14. May-Mitchell also asserts that his written consent to be towed should not have been admitted because it was made before he was given *Miranda* warnings. Since he did not raise this issue below, we will not recognize it on appeal absent plain error. *United States v. Long,* 674 F.2d 848, 854 n.9 855 (11th Cir.

interrogation can extend ... to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980) (emphasis in original). The exceptionally coercive atmosphere surrounding the seizure of the ship, May-Mitchell contends, made the situation one of "functional interrogation." He is incorrect. First, nothing in the record indicates any unusual degree of force during the seizure.[15] If we were to hold as May-Mitchell desires, almost any police arrest or seizure also would be so coercive as to transform a situation into one of functional interrogation. We decline to extend the notion of interrogation in so expansive a fashion. Moreover, May-Mitchell has shown no link between the coercion and his statements. However coercive the seizure was, it is evident that the Coast Guard neither intended it to cause incriminating statements nor should have known that it would cause such statements.[16]

### B. Glen-Archila's Statements

While being interviewed by an immigration official, and before receiving *Miranda* warnings, Glen-Archila gave his home address in Colombia, South America. At trial the government used the address he gave, which showed that he lived near May-Mitchell, as evidence that he was a member of a conspiracy to import the marijuana on the CAYMAN MAN into the United States. That statement, he argues, should not have been admitted during trial.[17] The government counters that such a routine biographical question does not require *Miranda* warnings.

The former Fifth Circuit has indicated that such warnings are indeed not necessary for such routine interrogation, even if custodial, if not intended to produce incriminating responses. In *United States v. Menichino*, 497 F.2d 935 (5th Cir. 1974), the defendant had been read *Miranda* warnings and sought to telephone an attorney. He was told that he could do so after booking, a process that included being asked to provide his name and address. During booking defendant volunteered an incriminating statement. In holding the statement admissible, the Court discussed the booking procedure: "The interrogation appears to have been a straightforward attempt to secure biographical data necessary to complete booking, and the questions asked did not relate, even tangentially, to criminal activity. [*United States v.*] *McDaniel*[, 463 F.2d 129 (5th Cir. 1972), *cert. denied*, 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973)] suggests that such an inquiry is permissible, a suggestion we endorse here." *Menichino, supra*, 497 F.2d at 941. The Court came to a similar conclusion in *United States v. Henry*, 604 F.2d 908, 915 (1979), ruling that immigration officials need not give *Miranda* warnings to a

---

1982). We find no plain error. Indeed, we find no error at all. The statement was not an admission of guilt but rather only written acknowledgement of his realization that he would be arrested once the ship was towed within American waters. The district court carefully instructed the jury that the consent should be considered only to be an explanation of the facts surrounding the towing of the ship and that it could not be used as evidence of guilt.

**15.** The only evidence of coercion that May-Mitchell advances is that the boarding party was armed, that the crew had to sit on the deck with their hands behind their heads, that May-Mitchell was told that marijuana was on the ship, and that he was asked to give consent to be towed into port. These facts hardly show any unusual degree of coercion.

**16.** May-Mitchell also argues that the statements discussed above, as well as other statements he made after being read *Miranda* warnings, should have been excluded because they were tainted by Fourth Amendment violations. Our holding that no Fourth Amendment violation occurred renders these arguments moot.

**17.** Because the government emphasized to the jury the importance of his being a neighbor of May-Mitchell as evidence of membership in a conspiracy, Glen-Archila asserts that the admission of the address could not have been harmless error. We assume that his assertion is correct. *See United States v. Bulman*, 667 F.2d 1374, 1384 (11th Cir. 1982) (admission of evidence obtained through violation of constitutional right need not mandate reversal if error harmless beyond reasonable doubt).

person entering the United States unless an interrogation becomes custodial and information is sought for use against the person in a criminal proceeding. This view has not been restricted to the former Fifth Circuit. The Second Circuit, in the precise context at issue here, has, for reasons similar to those presented in *Menichino,* directly held that routine biographical questions may be asked so long as they are part of a routine procedure and so long as the questions are not intended to induce incriminating responses. Responses to those questions, if they should later prove to be incriminating, may, the court concluded, be used at trial. *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1112–13 (2d Cir. 1975); *see United States v. Grant,* 549 F.2d 942, 946 (4th Cir.), *cert. denied,* 432 U.S. 908, 97 S.Ct. 2955, 53 L.Ed.2d 1081 (1977); *Harryman v. Estelle,* 616 F.2d 870, 871 (5th Cir.) (*citing LaVallee* with apparent approval), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). We conclude likewise.[18] The question in response to which Glen-Archila gave his address was, we believe, routine, biographical, and not intended to induce an incriminating response. A *Miranda* warning was unnecessary.

## IV. GLEN–ARCHILA'S EARLIER ARREST

### A. Admission of the Earlier Arrest

At trial the district court admitted evidence showing that Glen-Archila had been aboard a ship, the DON EMILIO, boarded by the Coast Guard in 1976 and found to have 76,000 pounds of marijuana on board. Glen-Archila charges that this was error.

▐▐▐ For evidence of an extrinsic act to be admissible as proof of intent, it must meet a two-pronged test. First, it must require the same intent as the charged of-

fense and the jury must be able to find that the defendant committed the extrinsic act.[19] Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice. *United States v. Roberts,* 619 F.2d 379, 382 (5th Cir. 1980); *United States v. Beechum,* 582 F.2d 898, 911, 913 (5th Cir. 1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). We can reverse the trial court's decision on whether to admit the evidence only for abuse of discretion. *United States v. Bulman,* 667 F.2d 1374, 1382 (11th Cir. 1982); *Beechum, supra,* 582 F.2d at 915. We find no abuse. The former Fifth Circuit has in the past noted the difficulty the government often has in proving intent in conspiracy cases. *Roberts, supra,* 619 F.2d at 382–83. Given that difficulty, the trial court was correct in determining that the probative value of Glen-Archila's presence and arrest on a ship carrying a cargo of marijuana was not substantially outweighed by the prejudicial effect of the evidence and that the jury could find that the intent underlying the extrinsic offense was of the same nature as that at issue here.

### B. Confidential Informant

The government learned of the voyage of the DON EMILIO through a confidential informant in Colombia. The informant was unpaid, had given reliable information previously, was not a drug smuggler, was not a coconspirator, and had given no information concerning Glen-Archila. He apparently had been present when the ship was loaded, knew its course, had attended a meeting of coconspirators, and had seen the ship leave Colombia. Glen-Archila sought disclosure of the informant's identity. The district court ruled orally at trial that disclosure

---

**18.** We emphasize that police may not use routine biographical questioning as a guise for obtaining incriminating information. If investigative questions are asked while routine information is being obtained—as apparently were asked in this case—answers to such questions are inadmissible if the suspect has not been read his *Miranda* rights. Even questions that usually are routine must be proceeded by *Mi-*

*randa* warnings if they are intended to produce answers that are incriminating. *See United States v. Henry,* 604 F.2d 908 (5th Cir. 1979).

**19.** Under Fed.R.Evid. 404(b), evidence of extrinsic acts, although inadmissible as proof of character, may be introduced for purposes such as proof of intent.

was not necessary. Glen-Archila again argues that the court erred.

In *Roviaro v. United States*, 353 U.S. 53, 62, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957), the Supreme Court established a balancing test for determining whether to compel disclosure of an informant's identity:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

The test has been applied often in the former Fifth Circuit, *see United States v. Diaz*, 655 F.2d 580, 586 n.4 (5th Cir. 1981), *petition for cert. pending.* The cases may be grouped into broad categories: disclosure of the identity of a tipster, for example, generally will not be required, while disclosure of the identity of a paid informant often will be. These cases do, however, indicate that resolution of the question does indeed depend largely on the particular circumstances of each case. *See id.* at 586–87; *United States v. Fischer*, 531 F.2d 783, 787 (5th Cir. 1976). On the facts of this case, we find disclosure unnecessary. The state has a strong interest in protecting the flow of information from informants on the drug trade and, in particular, in encouraging the cooperation of unpaid individuals such as the informant here. The record does not inform us as to whether this particular informant was expected to provide more information in the future, but he might well do so, having provided it more than once in the past. Moreover, compelling disclosure unnecessarily would generally chill the flow of information from informants and might well endanger the physical safety of the informant. Glen-Archila's need for the information does not counterbalance these important considerations. The information related only to the evidence concerning an extrinsic act, a consideration that makes it less important than if it related to the voyage of the CAYMAN MAN itself. Even with regard to the extrinsic act, Glen-Archila claims only that the informant would testify he did not see Glen-Archila help load the boat and did not meet him among the coconspirators. That information alone would not show that he did not know the nature of the cargo or that he was not a part of the conspiracy.[20] Finally, since the informant would not have been subject to a subpoena from this country, disclosure of his identity probably would have done Glen-Archila little good upon the trial of this case.

## C. Severance of May-Mitchell's Trial

May-Mitchell asserts that the district court should have severed his trial before admitting Glen-Archila's earlier arrest into evidence. May-Mitchell must show specific and compelling prejudice that indicates that the court abused its discretion by failing to sever. *Bulman, supra*, 667 F.2d at 1380; *United States v. Hewitt*, 663 F.2d 1381, 1390 (11th Cir. 1981). "This court has specifically held that the introduction of evidence regarding a codefendant's past criminal record does not in itself require severance." *Id.* There was no abuse of discretion.

## V. SUFFICIENCY OF THE EVIDENCE FOR CONVICTION

Each appellant disputes the sufficiency of the evidence for his conviction.

---

20. Law enforcement officers involved in the seizure of the DON EMILIO stated that they found marijuana in open passageways and that the odor of the cargo was quite noticeable before they boarded the vessel. Although there is evidence that some of the marijuana might have been unloaded before the vessel was captured, and hence that the cargo might have been shifted after the vessel's departure from Colombia, we believe that the testimony does strongly suggest that Glen-Archila must have known the nature of the cargo as of the time of boarding.

Common to their arguments is our standard of review, which is to determine whether, looking at the evidence in the light most favorable to the government, the jury necessarily must have entertained a reasonable doubt about a defendant's guilt. *Bulman, supra,* 667 F.2d at 1377.

### A. May-Mitchell's Conviction

 May-Mitchell contends that the evidence did not prove intent to import the marijuana on the CAYMAN MAN into the United States.[21] We disagree. The CAYMAN MAN was found only twenty miles from St. Augustine. A course plotted from May-Mitchell's navigation book showed a direct voyage from Colombia to a point near Florida. Finally, May-Mitchell stated that he was to make two drops before proceeding to the Bahamas. From this evidence, the jury quite easily could have concluded beyond a reasonable doubt that the United States was the intended destination of the marijuana on the ship.

### B. Glen-Archila's Conviction

 Glen-Archila disputes the sufficiency of the evidence proving his membership in a conspiracy to import marijuana. We have in the past elaborated on the quantum of proof sufficient for conviction in cases such as this, noting that "substantial evidence" must exist connecting a defendant to a conspiracy. *Bulman, supra,* 667 F.2d at 1377; *United States v. Malatesta,* 590 F.2d 1379, 1381 (5th Cir.) (en banc), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). That evidence must show the deliberate, knowing, specific intent to join the conspiracy, not merely association with persons in a conspiracy or presence at the scene of the crime. *Bulman, supra,* 667 F.2d at 1378; *United States v. DeSimone,* 660 F.2d 532, 537 (5th Cir. 1981). In the particular context of cases considering whether crew members were part of a conspiracy to import marijuana, the necessary intent may be inferred from the length of a voyage, the amount of marijuana, and the close relationship necessary among those on board. *United States v. DeWeese,* 632 F.2d 1267, 1272 (5th Cir. 1980), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981); *United States v. Alfrey,* 620 F.2d 551, 556 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980).

 Evaluated in light of the cases outlined above, the evidence linking Glen-Archila to a conspiracy to import marijuana into the United States was substantial. He was a crewman on a voyage of considerable length, was on a ship carrying a considerable quantity of marijuana, was a neighbor of May-Mitchell in Colombia, and had previously been arrested on another ship with a cargo of marijuana. Moreover, his fingerprints were found on documents on the CAYMAN MAN's navigation table, indicating that he had access to the navigation room and allowing the inference that he knew the vessel's course. A jury could have found beyond a reasonable doubt that Glen-Archila was a willing and knowing member of a conspiracy to import marijuana into the United States.

We find appellants' contentions devoid of merit. The judgment of the district court is AFFIRMED.

---

21. Although May-Mitchell raises no sufficiency arguments with respect to the other elements of the crime for which he was convicted, we have examined the record and find the evidence sufficient for all elements.