**UNITED STATES of America, Appellee,**

v.

**Robert M. AYRES, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Nicolo Pirri ARDIZZONE and Frank Termini, Defendants, Appellants.**

Nos. 83–1201, 83–1215.

United States Court of Appeals, First Circuit.

Argued Nov. 9, 1983.

Decided Jan. 19, 1984.

Judith H. Mizner, Boston, Mass., with whom Gail S. Strassfeld, Susan P. Sturm, and Silverglate, Gertner, Baker & Fine, Boston, Mass., were on brief, for Robert M. Ayres.

William A. Brown, Boston, Mass., with whom Brown & Prince, Boston, Mass., was on brief, for Nicolo Pirri Ardizzone.

Barry P. Wilson, Boston, Mass., on brief, for Frank Termini.

Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., and James E. O'Neil, Asst. U.S. Atty., Boston, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, RO-SENN,* Senior Circuit Judge, and BREYER, Circuit Judge.

ROSENN, Senior Circuit Judge.

The defendants, Frank Termini, Nicolo P. Ardizzone, and Robert M. Ayres, were tried to a jury in the United States District Court for the District of Rhode Island and convicted on drug-related charges[1] arising out of the smuggling of 8,785 pounds of marijuana. Following the imposition of sentence, each of the defendants appealed. We affirm.

### I.

In the summer of 1982, the Coast Guard received information relating to the smuggling of marijuana off the shore of Rhode Island. From late July through early August of 1982, the Coast Guard had the sailing vessel *Fiesta* under surveillance. On the evening of August 9, 1982, the Coast Guard moved to intercept it when it was one to two miles off Watch Hill, Rhode Island. The Coast Guard was assisted on land by the Drug Enforcement Agency's (DEA) Rhode Island Task Force. At 8:27 P.M., the Coast Guard boarded the *Fiesta*. They found two men, defendants Termini and Ardizzone, on board. The leader of the boarding party, Chief Petty Officer Gibson, ascertained upon inquiry that the vessel had no registration documents aboard. One officer smelled marijuana and observed numerous bales on the space below deck that he believed contained marijuana. The vessel contained 221 bales of marijuana weighing 8,785 pounds. The officers also found navigational charts suggesting that the boat had traveled outside United States territorial waters.

In the meantime, the task force took positions onshore to apprehend the intended recipients of the marijuana. At approximately 7:25 P.M., state officers Phelps and DiCarlo observed a truck, which was towing a white speedboat[2] about thirty feet in length on a trailer, turn onto the Quonochontaug Breachway. Federal agents met the state officers, passed along information received from the Coast Guard, and gave surveillance assignments. They assigned Phelps to the breachway area where he observed the truck and the trailer that he had seen earlier. The speedboat was no longer there. From his observation point, agent Furtado saw the speedboat go out to sea between 7:45 and 8:00 P.M. The agents communicated their observations to each other by radio.

A half hour later, a coast guard cutter illuminated the *Fiesta* now less than two miles from shore. Within seconds, Agent Furtado, who had been observing the *Fiesta* through binoculars, saw the speedboat turn and head directly back to shore. He saw it travel along the coast at a high rate of speed without using its running lights and ultimately enter the Quonochontaug Breachway. Phelps and DiCarlo left their positions and headed for the beach. By the

---

* Of the Third Circuit, sitting by designation.

1. Termini and Ardizzone were convicted of conspiracy to import 8,785 pounds of marijuana, in violation of 21 U.S.C. § 963 (1976), conspiracy to possess and distribute the marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(6) (1976 & Supp. V 1981) and 21 U.S.C. § 846 (1976), possession with intent to distribute the marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(6) (1976 & Supp. V 1981) and 18 U.S.C. § 2 (1976), and possession of six grams of cocaine, in violation of 21 U.S.C. § 844(a) (1976) and 18 U.S.C. § 2 (1976).

Ayres was convicted of conspiracy to possess and distribute the marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(6) (1976 & Supp. V 1981) and 21 U.S.C. § 846 (1976).

2. The Government asserts that the speedboat was a type frequently used in illegal drug-landing operations.

time they reached it, the speedboat had already been lifted from the water to the trailer and the truck was departing. The officers blocked the truck's path. The truck driver opened the cab door and fled, pursued by DiCarlo. Phelps ordered the passenger, defendant Ayres, to lie face down on the ground. Phelps handcuffed him, stood over him with a rifle, and gave him his *Miranda* warnings. In response to questioning by Phelps, Ayres made incriminating statements. Other agents arrived at the scene and searched the truck. They found two bags of marijuana in a storage area behind the driver's seat and a small vial of cocaine in a door pocket of the truck on the driver's side. The speedboat contained a box of tools. Phelps turned Ayres over to the Charlestown Police Department.

On the way to the Charlestown police station, Ayres was again advised of his rights. At the station, Ayres was placed in a holding cell and once more administered *Miranda* warnings. Deputy Marshal Thomas then questioned Ayres and Ayres made further incriminating statements. Thomas testified that Ayres told him that he was involved in a smuggling operation. Ayres also stated that he left his house that night to meet the boat. Defendants Termini and Ardizzone also made statements subsequent to their arrest and receipt of *Miranda* warnings. Termini admitted that he was engaged in a smuggling operation.

On appeal, the defendants raise a number of issues, the principal one relating to the failure of the trial judge to suppress statements made by defendant Ayres at the Charlestown police station. The other issues relate to evidentiary rulings by the trial judge, alleged violations of his sequestration order, and the denial of defendants' motion for a mistrial based on the jury's view of defendants Termini and Ardizzone in handcuffs while in the custody of marshals.

## II.

Ayres argues that the trial court should have suppressed his statements in which he admitted involvement in the smuggling op-

eration. At trial, the court did order that testimony about incriminating statements made by Ayres at the breachway be stricken because the comments were made while Ayres was handcuffed and a police officer stood over him with a rifle. The judge left it to the jury to decide whether the subsequent statements made by Ayres at the police station were voluntary. Ayres contends that these statements also should have been excluded as a product of an arrest made without probable cause. Ayres further argues that his statements at the police station were the unattenuated taint of his prior involuntary statements at the breachway.

■ We turn first to Ayres's contention that he was arrested without probable cause. A warrantless arrest is constitutionally valid if "at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Whether there is probable cause for a warrantless arrest is determined under an objective standard, not by inquiry into the officers' presumed motives. *United States v. McCambridge,* 551 F.2d 865, 870 (1st Cir. 1977). To sustain a warrantless arrest, the Government is not required to show that the arresting officer had "the quantum of proof necessary to convict." *United States v. Miller,* 589 F.2d 1117, 1128 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). Probable cause "is a practical, nontechnical conception" offering an acceptable compromise between competing societal interests in protecting citizens on the one hand from abusive interferences with privacy and unfounded charges of crime and on the other hand in recognizing the necessity to afford "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States,* 338

U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

█ In this case, the district court concluded that the facts available to the agents, when viewed in their entirety, sufficiently provided probable cause to arrest. We agree. At the time of Ayres's arrest,[3] the state officers and federal agents, operating together and in communication with each other, had observed the trailer and speedboat approach the breachway. Agents then saw the speedboat go out toward the *Fiesta,* and upon its illumination, turn about and speed for shore. They saw the speedboat as it proceeded rapidly along the shore without using its running lights. By the time they reached it at the breachway, it already had been removed from the water and loaded onto the truck, and the truck and its occupants were making a hurried departure. At this point, the officers knew that the *Fiesta* had a large quantity of marijuana aboard. Under such circumstances, the retreat of the speedboat from the marijuana-laden *Fiesta* and the obvious flight of its occupants with the truck, trailer, and speedboat were sufficient to warrant a prudent man in believing that the truck's occupants were involved in the smuggling operations.

█ Ayres also maintains that his statements at the police station were the unattenuated taint of his involuntary statements at the breachway. A statement made after effective *Miranda* warnings are provided may not be admissible if it is the fruit of an inadmissible prior statement. *See Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). The Court in *Brown* noted that several factors are relevant in determining whether a confession is a product of free will. Provision of *Miranda* warnings, although not dispositive, is an "important factor," as are "[t]he temporal proximity of the arrest and the confession, the presence of intervening cir-

cumstances ... and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S.Ct. at 2261–62.

█ In this case, the district court ruled that it was unnecessary for the officer to hold a rifle over Ayres after he had already been handcuffed. These circumstances attending Ayres's statements at the breachway led the trial court to suppress the statements as involuntary. The court also ruled that the subsequent police actions, removing Ayres to the station, rereading him his *Miranda* rights, and then questioning him later that evening in an atmosphere when he appeared to be relaxed, fully composed, and in an open cell, did not render Ayres's statements at the police station coercive or otherwise inadmissible.

This court has held that in deciding whether to admit a confession made subsequent to an inadmissible confession, "[t]he appropriate inquiry then becomes whether the conditions that rendered the earlier confessions inadmissible carried over to invalidate the subsequent one." *Knott v. Howard,* 511 F.2d 1060, 1061 (1st Cir.1975). In this case, removing Ayres from the scene where he was originally questioned, giving him his *Miranda* warnings for the third time, and interrogating him by a different officer when he was relaxed, composed, and uncoerced could well have dissipated whatever taint may have infected his prior statements at the breachway. We fail to see that Ayres's statements at the police station were inadmissible as a matter of law; we perceive no error in their admission.

█ Ayres also asserts that the trial judge erred in his instructions to the jury with respect to the voluntariness of Ayres's statements. The judge instructed the jury that the statements at the breachway were involuntary as a matter of law and must be disregarded, but that it was for the jury to determine whether Ayres's subsequent statements at the police station were volun-

---

**3.** The district court ruled that Ayres's arrest occurred on the beach at the time the agents blocked the exit of the truck. The Government argues that the arrest did not occur until a few seconds later, after the truck driver fled. Be-

cause we hold that there was probable cause to arrest Ayres at the time that the truck was blocked, there is no need to consider the Government's contention.

tary. Ayres contends that by declaring only the statements made at the breachway involuntary as a matter of law, the court's instructions to the jury implied that the court had concluded that the statements at the police station were voluntary. This argument is not persuasive. The court informed the jury in unmistakable terms that it was for the jury to determine whether the statements at the police station were voluntary. Although the court sustained a defense objection to the testimony about the statements made by Ayres at the breachway, it specifically instructed the jury that they alone were "the sole judges" of whether Ayres's later statements were or were not voluntary. The court did not imply that the statements at the police station were voluntary. We see no error in the instruction.

### III.

Each of the defendants argues that there were errors involving the Government's attempt to link Ayres with Termini and Ardizzone by demonstrating that Termini purchased from Sears Roebuck & Co. the set of tools found in the speedboat. The defendants maintain that the belated production of certain *Brady* materials, the violations of a court witness sequestration order, and the non-production of confidential coast guard information entitle them to a new trial.

■ Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), a defendant is entitled to request production of exculpatory evidence in the possession of the prosecution. In this case, a certain Sears Roebuck register receipt and a report of a failed photographic identification by a government witness, a sales clerk, were not disclosed to the defense until the middle of the trial. Government counsel explained that he was unaware of the failed photographic identification of the purchaser of the tools until the examination of the sales clerk in court. The materials, including the receipt, were thereupon given to the defendants in ample time to cross-examine the relevant witnesses. They only consisted of the single register receipt and the photographic display. The defendants have failed to show any prejudice by the production of the evidence during rather than before trial. *Cf. United States v. Holmes,* 722 F.2d 37 (4th Cir.1983) (one day to review stack of documents eight inches thick, which included 1,000 pages of testimony, insufficient under the Jencks Act). Absent prejudice, the defendants are not entitled to a new trial because of the belated production of the *Brady* materials.

■ The defendants also complain of the possible violation by two government witnesses of the court's sequestration order. One involved the testimony of a Sears Roebuck employee, Triplett, who discovered when he returned to the store that he had been inaccurate in his prior testimony as to the date on which he sold the tools to Termini. When Triplett concluded his original testimony, the court informed him not to discuss the case with anyone. When he returned for further examination, he acknowledged that he was present in the store when a co-employee and two supervisors informed him that the date of the sale was August 9th and not July 5th, as he had previously testified. The supervisors had confirmed the correct sales date with the aid of a cash register receipt first thought to be destroyed but later offered in evidence.

The other alleged violation of the sequestration order involved Sergeant Kelly. After having testified, Kelly received a telephone call from Agent Furtado informing him that he would be required to appear in court again and that Kelly was correct in the date that he had written in his report, August 9th, relating to the Sears Roebuck sale of the tools to Termini. When the defense later called Kelly as its witness, he testified that the date he had previously given, July 9th, was incorrect and that August 9th was correct. The defense interrupted Kelly's testimony with a motion for a mistrial because Kelly had violated the sequestration order by his conversation

with Furtado.[4] The court, in the exercise of its discretion, denied the motion.

The court and jury were fully informed of the circumstances under which the two witnesses had discussed the case during a break in their testimony. The jury was able to weigh the credibility of the change in the testimony of the witnesses. The trial court could also assess the conduct of the witnesses and determine whether it was deliberate and malicious, or unintentional and harmless. We perceive no error in the district court's exercise of its discretion to reject the motion for mistrial.

■ The defendants also argue that they were denied a fair trial because the trial court did not compel coast guard officials to answer certain questions posed by defense counsel. The coast guard officers had testified to the tracking of a vessel believed to be the *Fiesta,* its approximate location on different dates, and information of the time and place where it was to be met by smaller boats. The Government asserts, and our examination of the record does not contradict the assertion, that witnesses called by the prosecution did not invoke the Classified Information Procedures Act (the Act), 18 U.S.C. app. §§ 1–16 (Supp. V 1981), during their direct or cross-examination. The defense, however, called coast guard officers as their witnesses and attempted to ascertain the source of the information for the monitoring of the *Fiesta* when the Coast Guard first detected it. When they declined to answer questions posed by the defense pertaining to the source for the information received by the Coast Guard, on the ground that it might lead to disclosure of classified information, the court first sustained objections on the ground of relevancy. The court reached this decision after conducting an *in camera* hearing. Subsequently, when the issue as to importation arose, the court reconsidered and struck the coast guard officers' testimo-

ny pertaining to the locations of the vessel at sea as in any way identifying the *Fiesta,* except testimony as to its location on August 9th. The court instructed the jury that the stricken testimony could not be considered by them. The striking of the testimony obviously benefitted the defendants and we believe that this ruling and the curative charge provided the defendants with an adequate remedy. *See United States v. Porter,* 701 F.2d 1158, 1162 (6th Cir.1983) (whenever defendant is prevented by order from causing disclosure of classified information, the court may in the interests of justice order "such other action, in lieu of dismissing the indictment . . .," as it determines appropriate).

## IV.

■ The defendants claim that they are entitled to a new trial because on two occasions some of the jurors inadvertently saw one or more of the defendants in handcuffs while they were outside the courtroom. The Supreme Court noted in *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), that "no person should be tried while shackled and gagged except as a last resort." *Id.* at 344, 90 S.Ct. at 1061. This court has recently held that it is unconstitutional to confine a defendant at trial to a "prisoner's dock" in the absence of special security needs. *See Young v. Callahan,* 700 F.2d 32, 37 (1st Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983).

These cases, which serve to guarantee that a defendant's presumption of innocence will not be eroded at trial by the presence of physical restraint, deal with problems quite different from the one raised in this case. The defendants in the case *sub judice* were not shackled and gagged in the courtroom; they were handcuffed while transported to and from the courthouse. The jurors were not repeatedly reminded of the defendants' confinement;

---

**4.** Although the Government contends the defendants made no motion for relief with respect to Triplett's conversation with his superiors, we believe the motion with respect to Kelly was couched in terms sufficiently broad to include Triplett.

the jurors had only an inadvertent quick glimpse once or twice of the defendants in handcuffs out of court. This evanescent image of the defendants would hardly dilute their presumption of innocence. In *Dupont v. Hall,* 555 F.2d 15 (1st Cir.1977), this court held that a defendant was not entitled to a mistrial when a jury engaged in its final deliberations accidentally saw the defendant in custody. Care should be taken whenever reasonably possible to prevent the jurors from viewing a defendant handcuffed while the defendant is on trial. In the absence of a showing of prejudice, however, a fleeting glance by jurors of a defendant outside the courtroom in handcuffs does not justify a new trial.

## V.

In summary, the enforcement agents had probable cause to arrest Ayres, and the district court committed no error in admitting his statements at the police station, despite the exclusion of his earlier statements at the breachway. Ayres's statements at the police station provided ample evidence to establish his relationship to the *Fiesta* smuggling operation. Furthermore, none of the errors alleged by the defendants with regard to the identification of Termini as the purchaser of the tools requires a reversal of the defendants' convictions. The district court also did not err in refusing to order a mistrial upon discovery that some of the jurors had an out-of-court glimpse of the defendants in handcuffs.

The convictions are affirmed.