UNITED STATES of America

v.

Michael ABELL, et al., Defendants.

Crim. No. 82–00018–B.

United States District Court,
D. Maine.

May 18, 1984.

Jay P. McCloskey, Asst. U.S. Atty., Bangor, Me., for the U.S.

Arthur E. Huttoe, Miami, Fla., Richard Petersen, Vancouver, Wash., James W. Lawson, Boston, Mass., John Jenness, South Paris, Me., Richard R. Booth, Miami, Fla., Marshall S. Stern, Bangor, Me., Michael Korvick, Miami, Fla., George Goltzer, New York City, Edward Shohat, Miami, Fla., Richard Hall, Bangor, Me., David W. Kee, Bucksport, Me., Daniel Lilley, Portland, Me., Robert G. Fierer, Atlanta, Ga., for defendants.

### MEMORANDUM OF RULING ON INTRODUCTION OF ENTRY ON GUILLEN'S BOOKING CARD

CYR, District Judge.

At trial, Government counsel sought to introduce, as evidence of the nationality of defendants Guillen, Valdes and Lopez, booking cards which had been prepared upon the incarceration of those defendants at the Penobscot County Jail. Guillen sought to suppress and exclude his booking card, asserting (1) a violation of his *Miranda* rights; (2) that his statement constituted an involuntary confession; and (3) a hearsay objection.[1]

### FACTS

On the evening of July 4, 1982, Agent Mona Polen of the Drug Enforcement Administration [DEA] and Trooper Rick Varney of the Maine State Police arrested Guillen, Valdes and Lopez at the Stable Inn in Brewer, Maine. Although there is conflicting testimony as to whether Agent Polen advised the defendants of their *Miranda* rights, it is uncontroverted that any such advisement was in English, and that, as Polen knew [*see* Transcript of Hearing on Motions to Suppress, at 734], Guillen is able to speak very little English.

---

1. The similar objections raised by Valdes and Lopez to the admissibility of their booking cards need not be discussed, the jury having found Valdes and Lopez to be not guilty.

**1416**

At approximately 10:00 p.m. and within minutes after their arrests, the defendants were transported to the Penobscot County Jail. Agent Wayne Steadman of the DEA transported Valdes.[2] Guillen and Lopez were taken to the jail in a separate vehicle driven by a Brewer Police sergeant. Upon arriving at the jail, Agent Steadman separately strip-searched the defendants, one at a time. The searches were conducted at the end of an "extra hallway" adjoining the vestibule between the jail reception area and the cell block. Doors separate the hallway from both the reception area and the cell block; but no door separates the hallway from the vestibule itself. Therefore, anyone exiting or entering the general jail population (and therefore passing through the vestibule) could see the area where the searches were conducted. There is, however, no indication as to whether anyone was in the vestibule during any of the searches. When a defendant was being searched, the other two defendants apparently waited in the reception area with the police sergeant.

Agent Steadman, the police sergeant and the three defendants, none of whom was handcuffed, then gathered in the "extra hallway" for the purpose of completing the personal history statement forms which DEA agents complete whenever they make an arrest. At some point, defendant Lopez indicated some reluctance about answering the questions on the form. Hoping to overcome any confusion, Steadman responded that completing the forms was a "normal process." He added that the information would be needed to secure Lopez' release

on bail.[3] When all three defendants requested permission to make phone calls, Steadman responded that they would have access to a phone after their personal history statements were completed. Because of the language barrier between Agent Steadman and defendant Guillen, Steadman asked the other defendants to serve as translators. The two bilingual defendants agreed and the process of filling out the forms turned into a four-way conversation among Steadman and the three defendants. No defendant declined to answer any of the personal history questions, one of which inquired as to their places of birth. Each defendant responded that he was born in Cuba. Although the Court accepts Steadman's testimony that he asked the questions as a matter of routine, not investigation, the record makes clear that Steadman was aware of evidence that Cubans or other hispanic-appearing suspects had played a significant role in the conspiracy.

After the personal history statements had been completed, Steadman left the jail. Shortly thereafter and before being provided with an opportunity to use the phone, the defendants were "booked" by deputy sheriffs Joseph Leen and Stephen Warman of the Penobscot County Sheriff's Department.[4] As part of the booking process, which took place in the cell block, the defendants were asked certain questions from the standard booking card which is completed as to every prisoner. Neither Leen nor Warman had any reason to or in fact did believe that the answers to these

---

2. During this five-to-ten minute trip, Agent Steadman advised Valdes of his *Miranda* rights, in English. Valdes acknowledged that he understood his rights and expressly declined to waive them.

3. Defendant Lopez testified that Steadman had said that Lopez would not be brought before a judicial officer until he supplied the information needed to complete the form. In view of Steadman's testimony to the contrary and the testimony of defendants Duvall and Verderame that Steadman had told them only that the information as to their personal histories would have to come out at the bail hearing, the Court

finds that Steadman did not make the blatantly improper statement attributed to him by Lopez.

4. Deputy Leen testified that the booking process took place at or shortly after midnight on July 5, 1982 and that the time (2245) and date (July 4, 1982) entered on Guillen's booking card, *see* n. 5 *infra*, reflects the hour Guillen was brought to the jail. Deputy Warman testified that the time indicated on the form is the time at which it was filled out. In view of Deputy Leen's greater experience with the Sheriff's Department, the Court accepts his interpretation of the forms and his testimony that they were completed at or shortly after midnight.

routine questions [5] had any evidentiary value. Deputy Leen testified that he took the information from defendant Guillen, with one of the other defendants serving as translator. There is no record indication that any of the defendants was actually or even apparently reluctant to answer the booking questions.

At trial, Government counsel made known his intention to introduce the DEA personal history statements of Guillen, Lopez and Valdes. The defendants objected on the ground that their statements were involuntary confessions obtained in violation of the constitutional guidelines set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court interrupted the trial, permitting extensive *voir dire* on these issues. Indeed, counsel having failed to cover most of the material factual issues in the initial *voir dire* of Steadman, the Court required that Steadman be, and he was, recalled for further *voir dire*. In the meantime, Government counsel obtained the booking cards from the Penobscot County Jail.

Following *voir dire* and argument, the Court indicated that it had grave doubts as to the admissibility of the DEA personal history statements. Government counsel withdrew his offer of those statements, offering instead the booking cards, which the Court admitted, over defendants' objections. By stipulation between counsel to the Government and counsel to Guillen, rather than submitting Guillen's booking card to the jury, Government counsel read the entry which indicated that Guillen was born in Cuba.

## ⠆ MIRANDA

■ As construed in *Miranda v. Arizona, supra,* the Fifth Amendment requires that prior to custodial interrogation an accused must be advised

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. at 479, 86 S.Ct. at 1630. The Government did not contend that Guillen was effectively advised of his *Miranda* rights prior to answering Deputy Leen's

---

**5.** Guillen's booking card, Gov. Exhibit 27, was filled out as follows:

PRISONER'S JAIL RECORD

ID NO. 13121                                                    MILL NO. _____

don't know

NAME: Guillen, Gervasio – SS NO:        DATE: 07-04-82   TIME: 2245

ADDRESS: 3351 No West 20th St. Miami Fla    AKA:   None

SEX: M   RACE: C··ban  DOB: 06/19/27  PLACE OF BIRTH:  Cuba   AGE:   55

HEIGHT: 5'10" WT: 180 HAIR: Grey EYES: Lt.Blue BUILD: Hvy COMPLEX: Med

MARKS,TATTOOS: Scar on stomach GLASSES: Yes OCCUPATION:  Self-Employed Fisherman

OFFENSE: Conspiracy to Distribute Marijuana  HOLD FOR:  DEA

COURT DATES: IF BAILED:      IF HELD:      ARRESTING OFFICER: W. Steadman

COURT ACTION: COURT:   FED      CON'T      SENTENCE:

JUVENILE INFO: INTAKE WORKER:   N/A      DET. AUTH:   N/A

NEAREST RELATIVE: Nicolaza Guillen RELATIONSHIP: Mother PHONE: 633 1607

ADDRESS: 2118 No West 18th Ave. Miami Fla

BAIL:                        SET BY:

BAILED:           BY:

SEARCHED/PROCESSED BY:D/S H.Wilson PHOTOS:   PRINTS: H.W.  S/L:Sgt.Clark
                          J. Leen

questions. Nor did the Government contend that Guillen was not in custody at the time. Rather, the Government contended that Deputy Leen's questions, all of which were part of the routine booking procedure, did not constitute interrogation within the meaning of *Miranda.*

Although Guillen seemed to concede that questions as to routine biographical data do not constitute interrogation (contending instead that Leen's question as to place of birth was not such a question), the Court believes that the broader issue has not been finally resolved in the First Circuit.[6]

The starting point for defining 'interrogation' in this context is, of course, the Court's *Miranda* opinion. There the Court observed that '[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'

*Rhode Island v. Innis,* 446 U.S. 291, 298, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980), *quoting Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612. Noting that the "concern of the Court in *Miranda* was that the coercive environment created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination," *Rhode Island v. Innis,* 446 U.S. at 299, 100 S.Ct. at 1688, the Court held that the meaning of interrogation as used in *Miranda* is not limited to express questioning.

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest

---

**6.** Guillen's counsel indicated during oral argument that *United States v. Downing,* 665 F.2d 404 (1st Cir.1981), establishes that *Miranda* does not apply to routine biographical questions. Certainly this is a plausible reading of the decision. At page 406 the First Circuit noted that "[c]ourts have held that *Miranda* does not apply to biographical data necessary to complete booking" and the court specifically referred to "this limited exception" to *Miranda.* But this *dictum* is ambiguous at best. Citing *United States v. Prewitt,* 553 F.2d 1082, 1085–86 (7th Cir.), *cert. denied,* 434 U.S. 840, 98 S.Ct. 135, 54 L.Ed.2d 104 (1977), the court indicated that the "limited exception" for biographical data exists "because information about a suspect's identity is not 'testimonial' in character." 665 F.2d at 406. But it would be difficult to justify the rule on the basis that the answers to biographical questions are not testimonial. For example, the police asked the defendant in *Prewitt* whether he used any aliases. Noting that government personnel properly may record their observations of an arrestee's identifying characteristics, take his fingerprints and photograph, and compel the production of voice and handwriting exemplars, the Seventh Circuit implied that since an alias is "an identifying characteristic" the answer is not testimonial. But the analysis in a recent First Circuit decision, i.e., *United States v. Campbell,* 732 F.2d 1017 at 1021, No. 83–1222, slip op. at 10 (1st Cir. April 26, 1984), suggests that the *Prewitt* court "got off on the wrong foot." *Id.* The mere fact that a question is intended to and does elicit identifying information does not make the response nontestimo-

nial. *Id.* at 1021–1022. The Fifth Amendment is inapposite to the compelled production of voice and handwriting exemplars because they are obtained as examples of physical characteristics, and not for review of the content of the statements. *Gilbert v. California,* 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953–54, 18 L.Ed.2d 1178 (1968); *United States v. Campbell,* at 1021. Thus, the operative distinction is between communicative and noncommunicative conduct or statements. Applying the appropriate test, there can be no doubt that the question, "have you an alias?" calls for a communicative response, as does the question, "where were you born?"

Indeed, neither of the cases cited in *Downing* as recognizing the biographical data exception, i.e., *United States Ex Rel. Hines v. LaVallee,* 521 F.2d 1109 (2d Cir.1975); *United States v. Menichino,* 497 F.2d 935 (5th Cir.1974), based its holding on the view that the answers to such questions are nontestimonial. Indeed, although the *LaVallee* court observed the similarity between asking such questions and the compelled production of exemplars, the court recognized that the two are distinguishable because the answers to the questions, unlike the exemplars, are "testimonial in character." 521 F.2d at 1112. Thus, those courts recognized the exception, not because the answers to biographical questions are nontestimonial, but rather because the questions themselves are "noninvestigatory." *Id.* at 1113; *United States v. Menichino,* 497 F.2d at 941 n. 3.

and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 300–02, 100 S.Ct. at 1689–90. (Footnotes omitted.) Although *Innis* makes clear that interrogation is not limited to express questioning, the *Innis* holding does not speak directly to the inverse question: "whether all questions constitute interrogation?"

Two First Circuit decisions, i.e., *United States v. Montgomery*, 714 F.2d 201, 202 (1983), and *United States v. Downing, supra*, however, might be read as interpreting *Innis* to mean that every police question constitutes interrogation. In *Montgomery* the defendant initiated a conversation about the charges against him. During the brief conversation a federal agent asked two questions. Noting that, under *Innis*, interrogation includes express questioning and its functional equivalent, the First Circuit, without discussing the meaning of "questioning," held that "[s]ince the questioning here was express, we have no occasion to go farther. This was custodial

interrogation." *United States v. Montgomery*, 714 F.2d at 202. In *Downing*, an officer's inquiry, made while inventorying a defendant's possessions, as to what the defendant's keys were for, was held to constitute interrogation. The Court expressly refused to adopt an exception to the *Miranda* rule "for police questions asked without investigative intent or asked pursuant to 'required administrative procedures,'" explaining that "[t]he exception in *Innis* for police actions or statements 'normally attendant to arrest and custody' does not apply to the 'express questioning' which occurred here, but only to its 'functional equivalent.'" *United States v. Downing*, 665 F.2d at 407.

But although *Montgomery* and *Downing* suggest that every police question constitutes interrogation, they do not compel that conclusion. Both cases clearly involved interrogation. In *Montgomery* the officer's questions related directly to the crime. In *Downing* the Court could find no plausible noninvestigatory purpose for the questions, *United States v. Downing*, 665 F.2d at 407 n. 1, which "were 'reasonably likely to elicit an incriminating response,'" *id.* at 407.[7] Thus, the holdings of those two cases are not necessarily inconsistent with a view that noninvestigatory questions may not constitute interrogation. *See Rhode Island v. Innis*, 446 U.S. at 301–02, 100 S.Ct. at 1689–90. Moreover, the First Circuit's refusal to adopt an exception to *Miranda* for questions asked pursuant to required administrative procedures, or without investigative intent, does not preclude the conclusion that *Miranda* does not apply to noninvestigatory questions, since the absence of investigatory intent will not save even declaratory utterances from being classified as interrogation where the police should know that an incriminating response is likely, *Rhode Island v. Innis*, 446 U.S. at 301, 100 S.Ct. at 1689.

---

**7.** Moreover, prior to being asked about his keys, Downing had requested an attorney. The court appeared to condition its holding on the failure of the police to comply with this request, which gave rise to "unavoidable coerciveness." *United States v. Downing*, 665 F.2d at 406. Thus the court may have suggested that a different rule would apply where, as here, no such request had been made.

And although *Downing* and *Montgomery* may be read as suggesting that *Innis* requires that all police questions be treated as interrogation, neither the language nor the rationale of the *Innis* opinion compels such a rule. Even assuming that the *Innis* Court intended its *dicta* to mean that all "questioning" constitutes interrogation, the Court did not provide a definition of "questioning." Of course, the verb "to question" may be defined as including the asking of any question, but it is also subject to more precise definition, such as "to subject to judicial or police examination" and "to call to account." *Webster's Third International Dictionary*, at 1864 (unabridged ed. 1976). *Innis* suggests the applicability of a narrow definition. Having defined interrogation as "express questioning or its functional equivalent," the *Innis* Court made clear that by "functional equivalent" it meant actions or words which "the police should know are reasonably likely to elicit an *incriminating* response," and not just any response regardless how noncriminating. This *circumscription of the* "functional equivalent" of questioning suggests that the participle itself (questioning) was used (in its narrower sense) to refer solely to investigatory questions. Such an interpretation is also consistent with the requirement that " '[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself," *Rhode Island v. Innis*, 446 U.S. at 300, 100 S.Ct. at 1689. The Supreme Court's recent discussions portend no retreat from the view that the threat of compulsion is the *raison d'être* for the *Miranda* rule and the principal guide for its application. For example, in *Minnesota v. Murphy,* ── U.S. ──, ──, 104 S.Ct. 1136, 1142, 79 L.Ed.2d 409 (1984), the Court stated that *Miranda's* "extraordinary safeguard" applies only in

"the context of the inherently coercive custodial interrogations for which it was designed." [8] This principle gainsays the notion that the word "questioning" as used in *Innis* includes the asking of any question. Such a rule would mean that a question intended and likely to elicit only an innocent answer would trigger *Miranda's* "extraordinary safeguard," although a statement intended and likely to elicit the same response would not. Nothing in the Constitution, *Miranda* or its progeny requires the assignment of such importance to a mark of punctuation.

The Ninth Circuit has recently explained that

[m]any sorts of questions do not, by their very nature, involve the psychological intimidation that *Miranda* is designed to prevent. A definition of interrogation that included any question posed by a police officer would be broader than that required to implement the policy of *Miranda* itself. We hold, therefore, that custodial questioning constitutes interrogation whenever, under all the circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from the suspect."

*United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir.1981), *quoting Rhode Island v. Innis*, 446 U.S. at 301, 100 S.Ct. at 1689. The holding in *Booth* finds support in the many cases holding *Miranda* inapplicable to the gathering of biographical information, 2 Ringel, *Searches & Seizures, Arrests and Confessions* § 27.4(b) (1983), since most of those cases base their conclusion on the noninvestigatory nature of the question, not on the nontestimonial nature of the response. *See* n. 6 *supra*.

Applying such a definition leaves no doubt that Deputy Leen's question as to

---

**8.** Indeed, recent Supreme Court decisions suggest a shift in the definition of "custody," so as to restrict *Miranda's* application. *Miranda* defines custody as including any conduct which "deprive[s] [a person] of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612. But recent Supreme Court decisions indicate that "custody"

for purposes of *Miranda* is "narrowly circumscribed" and includes only "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Minnesota v. Murphy*, ── U.S. ──, ──── ──, 104 S.Ct. 1136, 1141–42, 79 L.Ed.2d 409 (1984); *California v. Beheler*, ── U.S. ──, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) [*per curiam*].

Guillen's place of birth did not constitute interrogation. The record makes clear that the question was not asked for an investigatory purpose, nor did Leen know or have any reason to believe that Guillen's response would prove to be incriminating.

But even assuming that the Supreme Court's explanation of the "functional equivalent" (of express questioning) must be disregarded in interpreting the meaning of "express questioning," the *Downing* opinion suggests a special exclusion allowing the police to collect biographical data. Indeed, Guillen does not contend that *Miranda* warnings must be given before requesting such information. Rather, Guillen asserts that a person's birthplace is not a biographical datum. Quoting *United States v. Menichino*, 497 F.2d at 941, the *Downing* court noted an exception to *Miranda* for "biographical data necessary to complete booking," *United States v. Downing*, 665 F.2d at 406. Seizing upon the use of the word "necessary," Guillen contends that the biographical data rule is inapposite, since the Government failed to produce evidence as to why it needed to know Guillen's place of birth. But from Deputy Leen's perspective the information was "needed to complete booking" because it was called for on the booking form, which he was required to complete. Nothing in *Downing* or *Menichino* suggests that this fact is insufficient to establish the requisite "need." The biographical data rule was inapplicable in *Downing* because the question that was asked related to personal property, not biography, and was likely to elicit an incriminating response. Thus, the Court concludes that the biographical data rule, as (apparently) *recognized in Downing*, applies to biographical questions which must be asked pursuant to established, noninvestigatory booking procedures and which do "not relate, even tangentially, to

criminal activity," *United States v. Menichino*, 497 F.2d at 941.

But even indulging in Guillen's apparent assumption, i.e., that need is determined from the perspective of the law enforcement agency, the biographical data exception applies. The Government's need for or interest in a particular law enforcement procedure is often a factor in determining the constitutionality of that procedure. *See, e.g., Texas v. Brown*, 460 U.S. 730, ——, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1983) [plurality opinion] [reasonableness of search turns in part on governmental need]. Although in such cases evidence as to the Government's need or interest is admissible, *see Immigration and Naturalization Service v. Delgado*, —— U.S. ——, ——, 104 S.Ct. 1758, 1765, 80 L.Ed.2d 247 (1984) [Powell, J., concurring] [discussing I.N.S. official's affidavit as evidence of governmental need for factory searches for illegal aliens], "need" often presents a quasi-legal issue to which courts speak, (apparently) without the benefit of record evidence. *See United States v. Place*, —— U.S. ——, ——, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983) [recognizing the need to detect and control narcotics traffic]. The need for biographical data is judicially recognized, presumably because agencies which arrest or jail individuals need to know the identity of the persons in their custody. Certainly, a person's birthplace is a reasonable starting point for checking or ascertaining an identification. *Cf. United States v. Glen-Archila*, 677 F.2d 809, 815–16 (11th Cir.1982) [applying biographical data rule to current address]. Neither the record nor defendant Guillen suggests any other reason for the inquiry. *See id.* at 816 n. 18.[9] Nor does the record suggest that Guillen believed that he was being asked to supply or in fact was supplying incriminating information. *Cf. Clewis v. Texas*, 386 U.S. 707, 711, 87 S.Ct. 1338, 1340, 18

---

**9.** Whether the biographical data rule applies to Steadman's inquiry might present a closer question, since Steadman knew of evidence linking Cubans or Hispanics to the conspiracy. But the DEA personal history statements were not admitted, Guillen does not contend that his state-

ment to Leen was the fruit of an earlier *Miranda* violation, and, in any event, the Court is satisfied that any impropriety in Steadman's inquiry did not taint the questions asked by Leen or the responses thereto, *see* pp. 1424–1425 *infra*.

L.Ed.2d 423 (1967) [suggesting that voluntariness is enhanced when question is asked "merely to secure information," rather than a confession].

## VOLUNTARINESS

■ The mere fact that *Miranda* warnings were not required does not render Guillen's statement admissible. Both the self-incrimination clause, *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), and the due process clause, *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978); *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), of the Fifth Amendment prohibit the use of a defendant's involuntary statement. For the statement to be voluntary "it must be 'the product of a rational intellect and a free will.'" *United States v. Holmes*, 632 F.2d 167, 169 (1st Cir.1980), *quoting Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963).

> The Due Process Clause does not mandate that the police forgo all questioning, or that they be given carte blanche to extract what they can from a suspect. The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.'

*Schneckloth v. Bustamonte* 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d

854 (1973), *quoting Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). *See also Procunier v. Atchley*, 400 U.S. 446, 453, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971). The determination as to voluntariness is based on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2047; *Procunier v. Atchley*, 400 U.S. at 453, 91 S.Ct. at 489.

■ Guillen has suggested that 18 U.S.C. § 3501 requires the exclusion of statements under a different, perhaps more stringent, definition of voluntariness. Section 3501(a) provides that voluntary confessions "shall be admissible." The statute directs the trial judge to test voluntariness based on "all the circumstances surrounding the giving of the confession," including certain enumerated factors,[10] but it does not purport to require the exclusion of any evidence. And the legislative history makes clear that, as the statutory language suggests, the congressional intent was to *broaden* the admissibility of confessions. Passed as part of Title II of the Omnibus Crime Control and Safe Streets Act of 1968, section 3501 was intended to overrule *Miranda* and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) [requiring the exclusion of confessions made during an unnecessary delay prior to an arrestee's initial appearance before a judicial officer]. *See* Senate Report (Judiciary Committee) No. 1097, *reprinted in* [1968] U.S.Code Cong. & Admin.News 2112, 2123–40, 2282. The Report assails *Miranda* as a "most disastrous blow to the cause of law enforcement in this country," *id.* at 2127, as an opinion which "misconstrues the Constitution," *id.* at 2136, and as establishing requirements which are "un-

---

**10.** Subsection (b) provides as follows:

(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

reasonable, unrealistic and extremely harmful to law enforcement," *id.* at 2132.

But even assuming, despite the language of the statute and the invective in its legislative history, that Congress intended section 3501 as requiring the *exclusion* of any evidence, it is clear that Congress did not intend to alter the *Sain* test for voluntariness.

As the Report notes, prior to *Miranda*, "voluntariness," as determined in light of the totality of the circumstances, had been the test for admissibility, *id.* at 2134, 2136, and the Report makes clear that Congress sought to "restor[e] the voluntariness test," *id.* at 2137, *see also id.* at 2138.[11] The mere fact that section 3501 lists certain specific factors, *see* n. 10 *supra,* does not indicate a congressional intent to alter the voluntariness test. The Senate Report correctly observes that the "specifically enumerated factors ... historically [have] enter[ed] into ... a determination [of voluntariness]," *id.* at 2137. Both the Senate Report, *id.* at 2137, and the statute itself, 18 U.S.C. § 3501(b), make clear that the enumerated factors are not exclusive. Finally, subsection (b) expressly provides that "[t]he presence or absence of any of the [enumerated] factors ... need not be conclusive on the issue of voluntariness...."

The courts which have closely examined section 3501 and its history have recognized that it was not intended as an obstacle to the admission of confessions, but rather as a means of restoring the preeminence of the voluntariness test. *United States v. Manuel,* 706 F.2d 908, 913 (9th Cir.1983); *United States v. Marrero,* 450 F.2d 373 (2d Cir.1971), *cert. denied,* 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972). *See also United States v. Holmes,* 632 F.2d at 168.

In addition to the five factors listed in section 3501(b), *see* n. 10 *supra,* the Court must consider the conditions under which and the length of time Guillen was held prior to making his statement. Although the statute lists as a relevant factor "the time elapsing between arrest and arraignment," 18 U.S.C. § 3501(b), the cases generally look to the delay between arrest and confession, *see, e.g., United States v. Halbert,* 436 F.2d 1226, 1237 (9th Cir.1970); *United States v. Monroe,* 397 F.Supp. 726, 732 (D.D.C.1975), since the critical issue is whether the confession was a product of the arrestee's free will. "The delay *after* the confession and before ... arraignment obviously [has] no effect on the prior confession and would not render it inadmissible." *United States v. Halbert,* 436 F.2d at 1237. Similarly, the nature and setting of the interrogation must be reviewed to determine whether oppressive police practices produced the statement. *Id. See also Brown v. Mississippi,* 297 U.S. at 281–82, 286, 56 S.Ct. at 462–63, 465.

■ Prior to answering Deputy Leen's questions, Guillen had been arrested, handcuffed, strip-searched and twice asked about his background. He had not been effectively advised of his right to and did not have the assistance of counsel. Nor had he been advised of his right to remain silent. Although the record indicates that he had been advised that he was under arrest on federal drug charges, apparently Guillen had not been advised of the precise charge. Viewed in context, however, these factors, which gave rise to no *Miranda* violation, *see* pp. 1417–1422 *supra,* do not suggest that Guillen's responses to Deputy Leen were involuntary.

The deputies never employed or threatened physical abuse, *see Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) [deprivation of food and sleep]; engaged in no deceptive interrogation prac-

---

11. Similarly, after noting that the dissenting justices in *Miranda* had expressed satisfaction with the voluntariness standard, the Senate Report alines itself wholeheartedly with the view expressed by the dissenting Justices and with what it feels are the views of the vast majority of judges, lawyers and plain citizens of our country who are so obviously aroused at the unrealistic opinions such as the *Miranda* decision (sic) which are having the effect of daily releasing upon the public vicious criminals who have voluntarily confessed their guilt. [1968] U.S.Code, Cong. & Admin.News, at 2136–37.

tices or strategems, *see Spano v. New York*, 360 U.S. 315, 322–24, 79 S.Ct. 1202, 1206–07, 3 L.Ed.2d 1265 (1959); and made no promises of leniency in order to induce any response, *see Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963). Indeed, the questions asked by Deputy Leen (within hours after Guillen's arrest) were not even investigative. *Cf. Clewis v. Texas*, 386 U.S. at 711, 87 S.Ct. at 1340 [noting that interrogation had been intended to elicit admission of guilt, and not "merely to secure information"]. Rather, these few questions were of the most routine nature. *See* n. 5 *supra.*

Assuredly, Guillen's limited facility with the English language might suggest that he had difficulty understanding the procedures, *cf. Reck v. Pate*, 367 U.S. at 441, 81 S.Ct. at 1546 [defendant's "subnormal intelligence" relevant to determination of voluntariness]; *United States v. Holmes*, 632 F.2d at 169 [defendant's use of drugs and/or alcohol relevant]; *Makarewicz v. Scafati*, 438 F.2d 474, 477–78 (1st Cir.1971) [age relevant]. But this possibility is gainsaid by the fact that his companions, Lopez and Valdes, served as translators. Indeed, the bolstering presence of Guillen's two companions is evidence of the voluntariness of his statements. *Clewis v. Texas*, 386 U.S. at 712, 87 S.Ct. at 1341. *See Davis v. North Carolina*, 384 U.S. 737, 745–46, 86 S.Ct. 1761, 1766–67, 16 L.Ed.2d 895 (1966); *Reck v. Pate*, 367 U.S. at 441, 81 S.Ct. at 1546; *Ashcraft v. Tennessee*, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944).

Finally, the Court must review the circumstances surrounding the earlier interview (during which Steadman completed Guillen's personal history statement) to determine how, if at all, that interview affected the voluntariness of Guillen's responses to Leen's questions. *See United States v. Ayres*, 725 F.2d 806 at 810 (1st Cir.1984).[12] Similar circumstances surrounded both interviews. Yet the Court did express grave doubts as to the voluntariness of statements made to Steadman. These doubts, however, were due in large part to Steadman's suggestion, in response to Lopez' expressed reluctance to answer the questions, that answering was a precondition to release on bail. Although Guillen may have been present at the time, there is no evidence that Steadman's statement was made to or translated for Guillen, who apparently cooperated without expressing any reluctance. The record does indicate that all three defendants requested access to the telephone and that Steadman said that they would be permitted to use the phone after their personal history statements were completed. In view of the totality of the surrounding circumstances and particularly the apparently relaxed atmosphere during the interview, the Court is satisfied that Guillen voluntarily disclosed his place of birth to Steadman. But even assuming that Steadman's refusal to permit access to a telephone (or his promise of subsequent access) rendered Guillen's statement involuntary, it does not appear that the effect carried over to invalidate Guillen's responses to Deputy Leen's questions. When Guillen responded to Leen's questions, his DEA personal history statement had been completed; it does not appear that access to a telephone (or any other right or privilege) had been conditioned upon completion of the booking cards.[13]

---

**12.** *Ayres* addresses the admissibility of a confession made subsequent to an involuntary confession, holding that " '[t]he appropriate inquiry [is] whether the conditions that rendered the earlier confession[ ] inadmissible carried over to invalidate the subsequent one.' " At 810, *quoting Knott v. Howard*, 511 F.2d 1060, 1061 (1st Cir.1975).

**13.** In many cases the mere fact that a suspect has made an incriminating statement bolsters the psychological pressure for repeated or additional self-incrimination. *Brown v. Illinois*, 422

U.S. 590, 605 n. 12, 95 S.Ct. 2254, 2262 n. 12, 45 L.Ed.2d 416 (1975); *Darwin v. Connecticut*, 391 U.S. 346, 350, 88 S.Ct. 1488, 1490, 20 L.Ed.2d 630 [Harlan, J., concurring and dissenting]. As the Supreme Court put it,

after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good.

Assuredly, to be arrested, strip-searched and booked can be traumatic. But a review of all of the surrounding circumstances, from arrest to "confession," precludes the conclusion that Guillen's "will [had] been overborne or his capacity for self-determination critically impaired."

## HEARSAY

The entry on the booking card as to Guillen's place of birth incorporates three out-of-court statements: Guillen's statement, the translation of his statement, and Deputy Leen's notation on the booking card. But since none of those statements is inadmissible hearsay the booking card was admissible. *See* Fed.R.Evid. 805. The statement of a party against whom the statement is offered is not hearsay. Fed.R.Evid. 801(d)(2)(A). The translation is exempted from the hearsay rule under Fed.R. Evid. 803(1), which exempts any "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." *See United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 323 (4th Cir.1982) [applying rule to allow introduction of summary of telephone conversation]; *United States v. Kehoe*, 562 F.2d 65, 70 (1st Cir.1977) [applying rule to secretary's notation that a witness had been sworn]. Deputy Leen's notation falls within the business record exception to the hearsay rule. Fed.R.Evid. 803(6).

For the reasons set forth above, defendant Guillen's motions to suppress and exclude, and his evidentiary objections to the admissibility of the booking card, were denied, denied and overruled, respectively.

*United States v. Bayer*, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947). But this consideration is largely absent where, as here, the defendant probably does not realize that his statement might prove incriminating. It is extremely unlikely that Guillen could have foreseen any material connection between his birthplace and the charge being brought against him. Indeed, as the Court repeatedly suggested during trial, there was no indication that the references by the various officers, during the investigation and trial, to Guillen, Lopez or Valdes as "Cuban" was anything other than a shorthand description of three hispanic-appearing suspects. Proof that Guillen was born in Cuba was neither necessary to prove the crime charged nor necessary to link Guillen to the conspiracy.